**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| STATE OF OHIO, ex rel. | : | |
| MICHAEL DeWINE, | : | JUDGE: |
| OHIO ATTORNEY GENERAL, | : | |
| 30 East Broad St., 25th Floor | : | |
| Columbus, Ohio 43215, | : | CASE NO.: 16CV2328 |
| | : | |
| And | : | |
| | : | |
| CLEVELAND-CUYAHOGA COUNTY | : | |
| PORT AUTHORITY, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES ARMY CORPS | : | |
| OF ENGINEERS; THE HONORABLE | : | |
| ERIC FANNING, SECRETARY | : | |
| OF THE UNITED STATES ARMY; | : | |
| THE HONORABLE JO-ELLEN DARCY, | : | |
| ASSISTANT SECRETARY OF THE ARMY | : | |
| FOR CIVIL WORKS; LIEUTENANT | : | |
| GENERAL TODD T. SEMONITE, CHIEF | : | |
| OF ENGINEERS AND COMMANDING | : | |
| GENERAL, UNITED STATES ARMY | : | |
| CORPS OF ENGINEERS; BRIGADIER | : | |
| GENERAL MARK TOY, | : | |
| UNITED STATES ARMY CORPS OF | : | |
| ENGINEERS, GREAT LAKES AND | : | |
| OHIO RIVER DIVISION; AND | : | |
| LIEUTENANT COLONEL ADAM | : | |
| CZEKANSKI, DISTRICT COMMANDER, | : | |
| UNITED STATES ARMY CORPS OF | : | |
| ENGINEERS, BUFFALO DISTRICT, | : | |
| | : | |
| Defendants. | : | |

**COMPLAINT
FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**

Plaintiffs, State of Ohio, ("State") by and through its counsel, Attorney General Michael DeWine, at the request of the Director of the Ohio Environmental Protection Agency ("Director of Ohio EPA") and the Director of the Ohio Department of Natural Resources ("Director of ODNR"), and the Cleveland Cuyahoga County Port Authority (the "Port" or "Port Authority"), file this Complaint for Declaratory and Injunctive Relief against Defendants United States Army Corps of Engineers; The Honorable Eric Fanning, Secretary of the United States Army; the Honorable Jo-Ellen Darcy, Assistant Secretary of the Army for Civil Works; Lieutenant General Todd T. Semonite, Chief of Engineers and Commanding General of the United States Army Corps of Engineers; Brigadier General Mark Toy, Great Lakes and Ohio River Division Commander for the United States Army Corps of Engineers; and Lieutenant Colonel Adam Czekanski, Buffalo District Commander for the United States Army Corps of Engineers (collectively "Defendants" or the "Corps"), as follows:

## NATURE OF THE CASE

1.      The Corps has unilaterally and in a manner contrary to compelling evidence determined that disposing of carcinogenic toxins in Lake Erie is environmentally acceptable. Because the State of Ohio refuses to permit the Corps to harm Lake Erie in this manner, which would violate both State and Federal law, the Corps is again threatening to sacrifice the navigability of the Federal Navigation Channel that includes over five miles of the Cuyahoga River and Cleveland Harbor—unless Ohio or some other non-Federal entity is willing to pay the

difference in cost between the Corps' unlawful decision and the environmentally acceptable and lawful alternative.

2.      In accordance with the Corps' duty to maintain the navigability of Great Lakes harbors, almost every year for the past 80 years, the Corps has deepened the Cleveland Harbor and the last six miles of the Cuyahoga River by removing sediment that has accumulated on the bottom of the channel.  This process, called dredging, is necessary for cargo ships to reach the industrial facilities along the Cuyahoga River because each year, sediment accumulates and makes the River and Harbor too shallow for lakers and other cargo ships to safely navigate.

3.      The sediment that has accumulated on the bottom of the Cleveland Harbor and Cuyahoga River contains toxic contaminants.  These harmful contaminants make the dredged material environmentally unsuitable for disposal in Lake Erie.  Therefore, virtually every year for the past 45 years since the passage of the Clean Water Act, the Corps has disposed of substantially all this dredged material in confined disposal facilities (also referred to as CDFs), which are large enclosed embankments that restrict the toxic sediment from entering the Lake.

4.      In 2014, the Corps unilaterally and arbitrarily determined that it would be environmentally acceptable to dispose of this dredged material in Lake Erie.  The Corps made this determination by finding a disposal site within Lake Erie which the Corps had previously contaminated and asserting that adding even more contaminated sediment to this disposal site is environmentally acceptable.  Ohio disagreed.

5.      On April 7, 2015, Ohio filed a Complaint against Defendants[1] challenging the Corps' unilateral decision and the application of that decision to the Corps' 2015 Annual

_____

[1] The names of the Defendants in the related 2015 lawsuit reflected those persons in the relevant positions in the Department of the Army at that time.

3

Cleveland Dredging Project (the "2015 Project"). That related case is still pending under case number 15CV00679. On May 13, 2015, Plaintiff the Cleveland-Cuyahoga County Port Authority (the "Port") filed an Intervening Complaint and was permitted to join that case.

6. On May 12, 2015, in granting Ohio's Motion for a Temporary Restraining Order and Preliminary Injunction, the Court ordered the following: 1) the Corps must "proceed with their original plan for dredging the Cleveland Harbor … including the … 'sixth mile';" 2) the Corps must "dispose of the dredging sediment in a Confined Disposal Facility and to pay all amounts required for such disposal;" and 3) the State of Ohio must "take steps to set aside $1,135,550 pending final resolution" of the case.

7. For the Corps' 2016 Annual Cleveland Dredging Project (the "2016 Project"), the Corps has applied the same unlawful determination that it had for the 2015 Project despite having new data confirming that the dredged material is approximately five times more polluted than Lake Erie background conditions.

8. Congress, through various Federal laws, has given Ohio authority to protect Ohio's portion of Lake Erie. The Corps is obligated to comply with all Federal laws, including those that give Ohio authority to protect the water quality of Lake Erie and Ohio's coastal zone. These Federal laws include: (1) the Submerged Lands Act (which confirms the State of Ohio's title to the submerged land under its portion of Lake Erie, on top of which the Corps wants to deposit the dredged material); (2) the Clean Water Act (which in part requires the Corps to obtain a state water quality certification for dredge and fill activities); and (3) the Coastal Zone Management Act (which requires all Federal activities to be consistent with Federally-approved state coastal management programs). Additionally, the Corps is restricted by: (1) the National Environmental Policy Act (which requires the Corps to take a hard look at the environmental

4

harm its projects could cause through a particularized process); (2) the Administrative Procedure Act (which prohibits the Corps from making arbitrary and capricious decisions and prohibits the Corps from taking actions that are inconsistent with other Federal laws); (3) the Corps' own regulations (which only permit open lake disposal if it is environmentally acceptable); and (4) U.S. EPA's regulations adopted pursuant to Clean Water Act Section 404(b)(1) (which in addition to other restrictions, require that disposal of dredged material comply with state water quality standards).

9. Under its Federally granted authority, Ohio has determined that toxic contaminants make the dredged material from the Cleveland Harbor unsuitable for disposal in Lake Erie because open-Lake placement would increase the amount of carcinogenic toxins in organisms (such as fish) that live in Lake Erie. Nonetheless, in violation of Federal law, Ohio law, and the Corps' own regulations, the Corps has unilaterally and unlawfully determined that placement of the majority of the dredged material from the Cleveland Harbor into Lake Erie is the only alternative that the Corps will perform at its own expense. In making this unprecedented and unilateral decision, the Corps purports to rely on its own regulations, asserting that open Lake disposal constitutes what the Corps calls the "Federal Standard."

10. Furthermore, despite the fact that the sediment in Cleveland Harbor is well above the Congressionally-established project limits, which determine when the Harbor must be dredged in order to maintain proper navigability, and despite the fact that the 2016 Dredging Project has already been approved, the Corps refuses to award a contract for the 2016 Project under the absurd pretense that the Harbor may not need dredging. At the same time, the Corps maintains that even if the Harbor needs to be dredged, the Corps demands that someone else pay for the Corps' Federal environmental compliance by committing to pay the cost differential for

disposal in confined disposal facilities versus in Lake Erie.  If no entity volunteers to pay for the Corps' duty, the Corps threatens not to dredge the full Federal channel, thereby causing catastrophic economic harm to local industry, the Port, the City of Cleveland, and the State of Ohio.

11.      The Corps' position again forces Ohio into a Catch-22 where it must choose between two unjust options:  either 1) submitting to the Corps' unlawful demand for money and in doing so possibly forgoing the right to challenge the Corps' unlawful determination of the "Federal Standard", or 2) passively accepting the severe economic distress that will befall local industry, the Port, the City of Cleveland, and the State of Ohio when the Corps allows the Cleveland Harbor to become unnavigable.

12.      The State of Ohio, the Port, and Ohio citizens are aggrieved by the Corps' failure to act, unlawful acts, and improperly conducted decision-making, and therefore are entitled to declaratory and injunctive relief under the Administrative Procedure Act, 5 U.S.C. §§ 701-706.

## PARTIES

13.      The Ohio Environmental Protection Agency ("Ohio EPA") is an agency of the State of Ohio and is responsible for environmental protection of the waters, lands, and environment of and in the State of Ohio, including lands, air, waters, wildlife, and plant life that will be adversely impacted by the 2015 Project and 2016 Project.  The Ohio Department of Natural Resources ("ODNR") is an agency of the State of Ohio that administers Ohio's Federally-approved Coastal Management Program ("CMP") and is responsible for monitoring activities that affect coastal resources and ensuring protection of Ohio's coastal resources.  The State is acting upon the request of the Directors of these two Agencies.  Pursuant to the public trust doctrine and implementing Federal law, the State of Ohio has a sovereign interest in the

6

submerged lands, waters, fish, wildlife, and other natural resources that will be affected by Defendants' actions.

14.     The Cleveland-Cuyahoga County Port Authority (the "Port") is a political subdivision created by the City of Cleveland and Cuyahoga County under Ohio Rev. Code Chapter 4582.  The Port Authority manages maritime operations at its port in Cleveland and links Northeast Ohio to global economic development activities. The Port Authority has direct interests in the continued viability and the commercial navigability of the Cleveland Harbor, including the federal navigation channel on the Cuyahoga River. The Port Authority also owns and/or operates combined disposal facilities ("CDFs") in which the Corps and private parties have disposed of dredged material from the Cleveland Harbor for over 45 years.

15.     The United States Army Corps of Engineers is an agency of the Federal government and is charged with, among other things, protecting and serving the nation's rivers and harbors in a manner that meets all environmental standards and requirements.  Specifically, the Corps is responsible for the operation and maintenance of dredging activity for the Cleveland Harbor Federal Navigation Channel.

16.     Defendant the Honorable Eric Fanning is named in his official capacity as the Secretary of the Army.  Secretary Fanning is responsible for implementing the policies, procedures and requirements of the United States Army, including the Corps, and applicable statutes and regulations relative to all water resources and Corps-owned or operated properties within the United States of America.

17.     Defendant Lieutenant General Todd T. Semonite is named in his official capacity as the Chief of Engineers and Commanding General of the United States Army Corps of

Engineers and oversees and directs the activities of the Corps, including the management of dredging operations at the Cleveland Harbor and Cuyahoga River Federal Navigation Channel.

18.     Defendant the Honorable Jo-Ellen Darcy is named in her official capacity as the Assistant Secretary of the Army for Civil Works.  Assistant Secretary Darcy establishes policy direction and provides supervision of the Department of the Army functions relating to all aspects of the Corps' Civil Works program, including all reimbursable work performed on behalf of Federal and non-Federal entities.  These responsibilities include programs for conservation and development of the nation's water and wetland resources, flood control, navigation, and shore protection.

19.     Defendant Brigadier General Mark Toy is named in his official capacity as the Great Lakes and Ohio River Division Commander for the Corps.  General Toy oversees and directs the activities of the Corps in that Division, including the management of dredging operations at the Cleveland Harbor and Cuyahoga River Federal Navigation Channel.

20.     Defendant Lieutenant Colonel Adam Czekanski is named in his official capacity as the Buffalo District Commander for the Corps.  His responsibilities include dredging waterways for navigation, protecting communities from flooding and coastal storms, responding to natural and declared disasters, regulating construction in the nation's waters and wetlands, remediating environmental hazards, restoring ecosystems, building facilities for the Army and Air Force, and providing engineering, contracting and project management services for other government agencies upon request.  He directly oversees and controls the activities of the Corps in the Buffalo District, including the management of dredging operations at the Cleveland Harbor and Cuyahoga River Federal Navigation Channel.

## JURISDICTION AND VENUE

8

21.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 (Federal question) and 28 U.S.C. § 1346 (Federal defendant) because this action arises under the laws of the United States, including:  the National Environmental Policy Act, 42 U.S.C. §§ 4321, *et seq.*; the Coastal Zone Management Act, 16 U.S.C. §§ 1451, *et seq.*; the Clean Water Act, 33 U.S.C. §§ 1251, *et seq.*; the Administrative Procedure Act, 5 U.S.C. §§ 701, *et seq.*; and the Corps' regulations, 33 C.F.R. §§ 335-338.  Additionally, this matter involves a Federal agency of the United States as a Defendant.

22.     There is a present, actual, and justiciable controversy between the parties, and the requested relief is proper under 28 U.S.C. § 2201 (declaratory relief); 28 U.S.C. § 2202 (injunctive relief); and the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.*  Plaintiff is also entitled to an award of costs and attorney fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

23.     Venue over this action is proper in this District pursuant to 28 U.S.C. § 1391(e)(3), which establishes venue in an action against an officer or agency of the United States in any judicial district in which one of the Plaintiffs resides, if no real property is involved in the action.  Venue is additionally appropriate in this District because the action sought to be reviewed takes place in this District and affects residents, natural resources, waters of the State of Ohio, and lands within the State of Ohio where dredging will occur and dredged material is proposed to be deposited.

## STATUTORY BACKGROUND

## WATER RESOURCES DEVELOPMENT ACT

24.     The Water Resources Development Act, 33 U.S.C. §§ 2311 *et seq*., authorizes the Corps to conduct navigation projects.

9

25.     Under the Water Resources Development Act of 1986, "[t]he Federal share of the cost of operation and maintenance of each navigation project for a harbor or inland harbor constructed by the Secretary pursuant to this Act or any other law approved after November 17, 1986, shall be 100 percent." 33 U.S.C. § 2211(b)(1); PL 99–662, November 17, 1986, 100 Stat 4082.

26.     Congress enacted the Water Resources Development Act of 2007, Public Law 110-114, in part to address navigability problems at Great Lakes harbors.  Specifically, that Act was enacted to rectify situations where the Corps' dredging appropriations have delayed dredging at Great Lakes harbors and channels.

27.     The Water Resources Development Act of 2007 requires the Corps to use available funds to "expedite the operation and maintenance, including dredging, of the navigation features of the Great Lakes and Connecting Channels for the purpose of supporting commercial navigation to authorized project depths."  33 U.S.C. § 426o-2.

28.     The legislative history of the Water Resources Development Act of 2007 indicates that Congress intended for that Act to direct the Corps to use available funds to dredge Great Lakes harbors because of the substantial problems the Corps' delayed dredging had imposed on commerce.  The Congressional Conference Committee reported the following:

> The Great Lakes contain 134 deep-draft harbors and six connecting channels **within the Corps of Engineers' dredging responsibility,** including 25 of the nation's largest ports.  The total waterborne commerce on the Great Lakes equals nearly 7 percent of the nation's maritime commerce.  **Recent shortfalls in the Corps' dredging appropriation have delayed dredging at many Great Lakes ports and waterways.**  The low water levels that have plagued the Lakes since the late 1990s have only exacerbated the problem.  As a result, the largest vessels in the Great Lakes fleet must forfeit nearly 270 tons of cargo for each 1-inch reduction in loaded draft. Ocean-going vessels in the international trade lose roughly 100 tons of cargo for each 1-inch loss of draft. Section 5014(a) directs the [Corps], using available appropriated funds, to expedite the operation and

maintenance, including dredging, of the navigation features of the Great Lakes and Connecting Channels for the purpose of supporting commercial navigation to authorized project depths.

H.R. Conf. Rep. 110-280 (emphasis added).

29.     Based on these public laws, the Corps is required to maintain the navigability of Great Lakes harbors by dredging the Cleveland Harbor and Cuyahoga River Federal Navigation Channel to the appropriate depths.

## NATIONAL ENVIRONMENTAL POLICY ACT

30.     Congress enacted the National Environmental Policy Act, 42 U.S.C. §§ 4321, *et seq.* ("NEPA"), to promote harmony between humans and their environment and to prevent or eliminate damage to the environment.  NEPA requires all Federal agencies, in every proposal for major Federal action that has a significant impact on the environment, to prepare and consider a detailed environmental impact statement ("EIS") that includes the action's adverse effects, alternatives to the action, and the action's long term effects.

31.     Pursuant to 40 C.F.R. § 1506.2, Federal agencies must cooperate with states to the fullest extent on environmental studies, and address inconsistencies between the proposed major Federal action and state or local plans.

## CLEAN WATER ACT

32.     The Clean Water Act, 33 U.S.C. §§ 1251, *et seq.* ("CWA"), was enacted to protect and improve the quality of the nation's waters.  The CWA recognizes that water quality is a primary state function, and requires any person seeking to conduct a project that involves the placement of dredged material into navigable waters to obtain a State Water Quality Certification through which a state certifies that the person will comply with the state's water quality

standards and may impose any conditions required for compliance with state standards.  33 U.S.C. § 1341.

33.    The CWA requires any person conducting a regulated project, including the Federal government, to comply with state water quality standards.  33 U.S.C. § 1323; 33 U.S.C. § 1341; 33 C.F.R. § 336.1.

34.    When the Clean Water Act was amended in 1977, the Senate Committee on Environment and Public Works specifically addressed the Corps' obligation to comply with state water quality standards when performing dredging activities by reporting the following:

> Section 404 [of the Clean Water Act]-- mandates that all dredging activities of the U.S. Army Corps of Engineers be conducted in compliance with applicable state water quality standards, and all other State substantive and procedural requirements.
>
> ***
>
> By this amendment [to section 404 of the Clean Water Act], the committee clarifies that corps dredging activities are not exempt from State pollution abatement requirements.  …  **Congress intended that section 404 in the 1972 [Clean Water Act] would in its initial implementation end the open water disposal of dredge spoil….**  Several corps district offices to date have requested and received funds to provide on land or confined disposal of dredge spoil. Pursuant to this amendment, **the corps may be required by the States in some instances to expend additional funds to protect water quality.**

S.Rep. 95-370 (emphasis added).

## COASTAL ZONE MANAGEMENT ACT

35.    The Coastal Zone Management Act, 16 U.S.C. §§ 1451 *et seq*. ("CZMA"), was enacted to ensure coordination and consistency between Federal, state, and local actions in coastal zones.  The CZMA authorizes and encourages states to develop coastal management programs, which allow states to protect their coastal zones by providing a Federally-authorized vehicle for the states to regulate the activities that occur within their coastal zones.  The CZMA

requires Federal activities within or that affect a state's coastal zone to be consistent to the maximum extent practicable with that state's coastal management program.

36.     The legislative history of the CZMA indicates that Congress intended for the CZMA to give states Federally-authorized control over their coastal zones.  Specifically, the Senate Commerce Committee reported that "the intent of this legislation is to enhance state authority by encouraging and assisting the states to assume planning and regulatory powers over their coastal zones…. [I]t is essential that Federal agencies administer their programs, including development projects, consistent with the states' coastal zone management program."  S.Rep. 92-753.

37.     Furthermore, when Congress amended the CZMA in 1990, the Congressional Conference Committee specifically addressed the necessity for Federal agencies' dredging projects to comply with state coastal management programs by reporting the following:

> [It is unnecessary to include a] specific clarification that Federal agency activities and Federal permits under the Ocean Dumping Act, including ocean dumping site designations, and operation and maintenance dredging, are subject to the requirements of section 307… because the amendments to section 307(c)(1) leave no doubt that **all Federal agency activities and all Federal permits are subject to the CZMA's consistency requirements**…. a statutory "listing" of activities should be avoided to prevent any implication that unlisted activities are not covered.  Finally, the conferees **are aware of the argument that the application of Federal consistency to activities under the Ocean Dumping Act amounts to state regulations of ocean dumping** for purposes of section 106(d) of that Act.  **The conferees reject this argument**.

H.Rep. 101–964 (emphasis added).

38.     Pursuant to the CZMA, before undertaking a project in a state's coastal zone, Federal agencies must ensure that the project is consistent with that state's coastal management program to the maximum extent practicable and must provide that state with a consistency determination.  16 U.S.C. § 1456.  The state may then issue the Federal agency a concurrence, a

13

conditional concurrence, or an objection to the Federal agency's consistency determination.  15 C.F.R. §§ 930.41, 930.43.

39.    The CZMA is implemented by the Department of Commerce through the National Oceanic and Atmospheric Administration ("NOAA").  NOAA's regulations define "maximum extent practicable" as fully consistent with the enforceable policies of management programs unless full consistency is prohibited by existing law applicable to the Federal agency. 15 C.F.R. § 930.32.  NOAA's regulations also prohibit a Federal agency from using funding restraints to demonstrate compliance to the maximum extent practicable.  "Federal agencies should include the cost of being fully consistent with [state CMPs] … in their budget …, **to the same extent** that a Federal agency would plan for the cost **of complying with other Federal requirements**."  15 C.F.R. § 930.32 (emphasis added).

### ENERGY AND WATER DEVELOPMENT AND RELATED AGENCIES APPROPRIATIONS ACT, 2016

40.    The Corps is funded through the annual Federal appropriations process.  For 2016, the Corps received its 2016 harbor operation and maintenance funding pursuant to the Energy And Water Development And Related Agencies Appropriations Act as part of the Consolidated Appropriations Act, 2016, PL 114-113, December 18, 2015, 129 Stat 2242.

41.    The Energy And Water Development And Related Agencies Appropriations Act, in part states:  "None of the funds in this Act shall be used for an open lake placement alternative of dredged material, after evaluating the least costly, environmentally acceptable manner for the disposal or management of dredged material originating from Lake Erie or tributaries thereto, unless it is approved under a State water quality certification pursuant to 33 U.S.C. 1341." Consolidated Appropriations Act, 2016, PL 114-113, December 18, 2015, 129 Stat 2242.

14

## ADMINISTRATIVE PROCEDURE ACT

42.     The Administrative Procedure Act, 5 U.S.C. §§ 701, *et seq*. ("APA"), provides that judicial review is appropriate if a person/entity has suffered a legal wrong because of agency action, or has been adversely affected or aggrieved by agency action.  5 U.S.C. § 702.  Section 551 of the APA defines agency action to include "the whole or part of an agency rule, order, license, sanction, relief or the equivalent denial thereof, or failure to act."  5 U.S.C. § 551(13).

43.     Agency actions are subject to judicial review under the APA if they are "final agency actions."  5 U.S.C. § 704.

44.     A reviewing court, pursuant to the APA, can compel agency action unlawfully withheld or unreasonably delayed, or set aside agency action, findings, or conclusions if they are found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law or without observance of procedure required by law among other things.  5 U.S.C. § 706.

45.     A reviewing court can also hold unlawful and set aside agency actions in excess of statutory jurisdiction, authority, or limitations, or short of statutory right pursuant to the APA. 5 U.S.C. § 706(C).

## CORPS' REGULATIONS

46.     The Corps' Federal Standard regulations set forth the policies and procedures related to the Corps' operation and maintenance activities. 33 C.F.R. § 335.1.  Once the relative priority of a maintenance project is determined and Congress allocates funds, it is the responsibility of the Corps to carry out the work by selecting the dredged material disposal alternative(s) which is the least costly and consistent with sound engineering practices but still meets the environmental standards established by the 404(b)(1) evaluation process.  33 C.F.R. § 335.7.  The Corps is required to fully consider all practicable and reasonable alternatives on an

equal basis.  33 C.F.R. § 335.4.  Under the Corps' policies, the Corps makes its formal Federal Standard determination for a particular harbor in one of two formal documents: a Preliminary Assessment or a Dredged Material Management Plan. *Great Lakes Dredged Material Management Conceptual Determination of the Federal Standard and Base Plan for Regional Consistency* (*Aug. 26, 2013).*

47.    Once the Corps has made a formal Federal Standard determination for a particular harbor, that determination remains the Federal Standard for that harbor until changed.

### U.S. EPA's 404(b)(1) Guidelines

48.    The CWA prohibits the use of a site for the disposal of dredged material unless the discharge of that dredged material is permitted under U.S. EPA's 404(b)(1) guidelines (which are promulgated at 40 C.F.R. § 230). 33 U.S.C. § 1344(b)(1).

49.    The Corps' regulations state that for an alternative to be the Federal Standard, that alternative must be one that complies with U.S. EPA's 404(b)(1) guidelines. 33 C.F.R. § 335.7.

50.    U.S. EPA's 404(b)(1) guidelines establish a process for evaluating whether the discharge of dredged material into waters of the United States could be permitted.  However, those guidelines also explicitly prohibit the discharge of dredged material if:  the discharge "[c]auses or contributes, after consideration of disposal site dilution and dispersion, to violations of any applicable State water quality standard" or "there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem." 40 C.F.R. § 230.10.

### FACTUAL ALLEGATIONS

### Annual Dredging of the Cleveland Harbor Federal Navigation Channels

16

51.     The Corps is responsible for implementing Federal navigation projects around the country.  In performing these projects, the Corps is required to comply with various Federal and state environmental laws and regulations.

52.     Specifically with regard to the Great Lakes, the Corps must use available funds to "expedite the operation and maintenance, including dredging, of the navigation features of the Great Lakes and Connecting Channels for the purpose of supporting commercial navigation to authorized project depths."  33 U.S.C. § 426o-2.  "In operating and maintaining Federal channels and harbors of … the Great Lakes, the [Corps] shall conduct such dredging as is necessary to ensure minimal operation depths consistent with the original authorized depths of the channels and harbors when water levels in the Great Lakes are, or are forecast to be, below the International Great Lakes Datum of 1985."  33 U.S.C. § 426o-1.

53.     The Cleveland Harbor Federal Navigation Channel (the "Cleveland Harbor") is a navigation feature of the Great Lakes, which consists of 5.5 miles along the Cleveland shoreline that is enclosed by breakwater structures, 5.8 miles of the lower Cuyahoga River, and 1 mile of the Old River.

54.     The Cuyahoga River is a river that exists wholly within the State of Ohio.  It originates in Geauga County, Ohio, flows south to Akron, Ohio, then flows back north, and ultimately enters Lake Erie through the Cleveland Harbor.  The Cuyahoga River is a "water of the State" under OHIO REV. CODE § 6111.01(H).

55.     The southernmost mile of the Cuyahoga River that is within the Cleveland Harbor is referred to herein as the "Upper Cuyahoga Navigation Channel" or "Upper Mile."

56.     The Cleveland Harbor is a deep-draft commercial harbor located on Lake Erie in Cuyahoga County, Ohio.  The Cleveland Harbor is the 48th-largest United States port by weight of cargo.

57.      A number of industrial facilities rely on the Cleveland Harbor to both receive raw materials and ship finished products.

58.     Located on both sides of the Upper Cuyahoga Navigation Channel, is ArcelorMittal's Cleveland steel plant, which includes two blast furnaces within 950 acres of property.

59.     ArcelorMittal's Cleveland plant is wholly reliant on maritime deliveries through the Cleveland Harbor and the Upper Cuyahoga Navigation Channel to receive approximately four to five million tons of iron ore and limestone per year, both of which are essential raw materials for steel production.

60.     For commercial cargo ships to safely navigate the Cleveland Harbor, it must be dredged to depths ranging from 25 to 29 feet below low water datum ("LWD") in the Outer Harbor Channels and 23 feet below LWD in the Upper Cuyahoga Navigation Channel.  The Corps has regularly dredged the Cleveland Harbor in this manner for the past 45 years.

61.     Dredging is necessary and required annually because sediment accumulates at the bottom of the Cleveland Harbor throughout the year due to the natural flow of the River and runoff into the River.  The sediment that is removed consists of both the sediment that has accumulated since the previous dredging event and historic sediment that becomes interspersed with the accumulated sediment.  This interspersion occurs because the sediment that is removed creates a void.  That void is filled in part by the historic sediments that fall from the sides of the Channel into the void in the center.

18

62.     If portions of the Cleveland Harbor become too shallow, then cargo ships will be prohibited from entering those portions, thereby cutting off access to commercial and industrial facilities located within the Cleveland Harbor.

63.     It is essential for facilities along the Upper Cuyahoga Navigation Channel to have access to the full Channel throughout the shipping season in order to receive enough raw materials to create a sufficient inventory to continue production throughout the winter.  Raw materials brought up through the Upper Cuyahoga Navigation Channel come from Minnesota, meaning that shipments can no longer be made once the Soo and Poe Locks are closed for the winter.  The ships using the Upper Cuyahoga Navigation Channel cannot deliver enough cargo to create a sufficient inventory for ArcelorMittal to remain open throughout the winter when the ships are forced to sacrifice significant amounts of cargo per trip over any prolonged period of the shipping season.

64.     In order to maintain navigation, the Corps' annual Cleveland dredging projects typically involve removing approximately 225,000 cubic yards or more of sediment from the Cleveland Harbor.  About 80% of this sediment is in the Upper Cuyahoga Navigation Channel. The Corps breaks the Upper Cuyahoga Navigation Channel up into three segments and refers to them as the following:  DMMU-1; DMMU-2a; and DMMU2b.  The sediment within the Upper Cuyahoga Navigation Channel is referred to herein as the "Upper Mile sediment."

65.     Nearly every year for the past 45 years, the Corps has annually placed all of the Cleveland Harbor dredged material in the confined disposal facilities ("CDFs") which restrict the sediment from entering Lake Erie.

66.     Several CDFs are currently in operation and have sufficient space for both the dredged material from the 2016 Project and future annual dredging projects.  These confined

disposal facilities are identified numerically by the Corps as follows:  10B, 9, and 12.  Each one of these CDFs is located on the northern edge of Burke Lakefront Airport near the Lake Erie Shoreline.

### The Port Authority's Role

67.     The Port Authority is an operator or owner/operator of two of the CDFs at issue in this case (CDFs 9 and 12). With respect to CDF 9, the CDF is held in the name of the City of Cleveland, but the Port Authority, through agreement of the parties, operates the CDF.

68.     With respect to CDF 12, the Port Authority owns and manages CDF 12 and is responsible for negotiating with the Corps to allow the Corps right of entry and access for purposes of continued CDF operation.

69.     For several years, the Port actively negotiated a WRDA Section 217 Agreement with the Corps under which the Port would have a tipping-fee arrangement with the Corps for the disposal of dredged material in CDF 12. This plan was sometimes referred to as "Plan A" and provided capacity through mechanical placement for 35 years of Cleveland Harbor dredging.

70.      In August 2014, because of the Corps' delay in approving existing plans and declining to look beyond its own open-Lake disposal proposal, the Port Authority prepared a revised approach, named "Plan B," that allowed for hydraulic delivery at CDF 12, and still allowed for the efficient mechanical placement of material. The Port Authority's "Plan B" was part of the package of options called "schedule B" that the Corps presented to bidders for 2015 dredging.

71.     On March 9, 2015, the Corps issued a Draft Finding of No Significant Impact and Environmental Assessment (FONSI/EA) regarding CDF capacity expansion for the disposal of dredged material not suitable for open-lake placement.  The draft FONSI reports the Corps'

determination that there was no significant impact from the Port's Section 217 Agreement alternative (mechanical handling and placement into CDF 12). It demonstrated the Port's Section 217 Agreement could provide disposal capacity for four years without any open-Lake placement of dredged material.

72. The March 9, 2015 FONSI/EA also recognized "[w]ithout dredging, the navigation channel would progressively shoal in and eventually impede commercial navigation."

73. "Plan B" has been intensively evaluated by the Port Authority, the Corps and the State. Plan B utilizes a combination of known technologies to maximize CDF capacity by including the mechanical placement on CDF 12 as outlined in Alternative 7 (Plan A), selected by the Corps in its 2015 Draft EA/FONSI. Plan B will also utilize technologies for: (1) hydraulic disposal into CDF 12 in the same manner that the Corps has utilized for over 45 years; (2) aggressive dewatering of dredged material onsite utilizing CDFs 9 and 12; (3) recovery of appropriate sediment from dredged material for marketing and beneficial reuse, including beach nourishment; and (4) ultimately, efficient mechanical placement and stacking on CDF 12 of dredged material not appropriate for reuse at this time. The refined techniques allow for lower tipping fees than originally approved by the Corps in the Section 217 negotiations.

74. Throughout this dispute, the Port Authority has been an active participant, identifying and implementing sustainable CDF capacity solutions for several reasons: a WRDA 217 Plan B-type approach is the lowest cost approach that complies with all applicable environmental regulations, including all of Ohio's water quality standards and all of its federally-approved Coastal Zone Management Policies; it provides all necessary short term capacity to prevent contaminated dredge sediments from being dispersed in Lake Erie; it institutes mechanical placement that can provide the decades of capacity the Corps requires to fulfill its

statutory obligations to maintain commercial navigation in Cleveland Harbor without the staggering expense of building a new CDF or the environmental detriment of open-Lake disposal; and it makes marketable and usable dredged material available for beach nourishment, construction uses and urban revitalization purposes instead of treating all dredged material as a mere waste. Importantly, Ohio EPA has granted 401 certification for disposal of dredged material in CDFs 9 and 12, thus confirming that Plan B is a practicable upland alternative to open-Lake placement and consistent with Ohio's water quality standards.

75.     To ensure continued availability for future disposal, the Port Authority has made significant financial investment, in excess of $5 million since 2010, to ensure on-going preparedness to provide adequate CDF capacity, and has worked in partnership with Ohio EPA to develop innovative approaches to effectively address sediment management.

76.     During 2016, the Port made several significant improvements to CDF 12 to ensure capacity for accepting dredged sediments into the future.  The Port's current CDF system is designed to provide CDF processing and storage capacity for the next 43 years based on annual dredging volumes (federal and private) of 250,000 cubic yards.

77.     In the last five years, Port Authority revenues from shipping, which are at risk in this matter, have averaged more than $1 million per year. The potential effect of the Corps' refusal to dredge, including the Port Authority's loss of revenue, would be far-reaching.

### The 2016 Project

78.     Consistent with previous annual Cleveland Harbor Dredging projects, on November 20, 2015, the Corps issued a public notice announcing that the Corps would dredge approximately 225,000 cubic yards of sediment from the Cleveland Harbor during its 2016 dredging operation.

79.     The Corps also stated on November 20, 2015, that its preferred disposal method for the Upper Mile sediment was open-Lake disposal and that if Ohio EPA would not allow it to dispose of the Upper Mile sediment in Lake Erie, it would refuse to dredge unless someone else paid the additional costs of CDF disposal.

80.     On November 20, 2015, the Corps also proposed to expand the 2016 Project beyond the limits of the 2015 Project by proposing to use the dredge material to remediate a portion of Lake Erie that the Corps contaminated with dredged material prior to the 1970s. However, the Corps did not evaluate this expanded project under the NEPA process.

81.     Upon information and belief, for the 2016 Project, the Corps is applying a Federal Standard that it claims to have determined on December 17, 2014.

82.     The Corps' most recent Federal Standard determination prior to December 17, 2014 was disposal of the Upper Mile sediment in CDFs.

83.     Upon information and belief, the Corps did not make another Federal Standard determination for the Cleveland Harbor after December 17, 2014.

84.     Upon information and belief, the Corps did not finalize a Preliminary Assessment or Dredged Material Management Plan for the Cleveland Harbor after December 17, 2014.

85.     The Federal Standard remains CDF disposal of the Upper Mile sediment because the Federal Standard was never formally changed.

86.     In or around January 2016, the Corps issued a request for bids for the 2016 Project.  In March 2016, the Corps received bids for the 2016 Project.

87.     On July 14, 2016, the Corps performed a depth survey of the Upper Cuyahoga Navigation Channel, which revealed that the vast majority of the Upper Cuyahoga Navigation

23

Channel was above project limits, i.e., 23 feet below Low Water Datum, triggering the Corps' duty to dredge.  The Corps did not release the results of this survey until August 5, 2016.

88.     As of September 19, 2016, and throughout August and September of 2016, ships have not been able to traverse the Upper Cuyahoga Navigation Channel without severely reducing their cargo loads ("light loading").  Ships traversing the Upper Cuyahoga Navigation Channel are light loading by nearly 20% of their capacity (5,000 tons of material per trip).  Additionally, even with reduced cargo loads, the ships are only able to fully traverse the Upper Cuyahoga Navigation Channel by plowing their keels through the shoaled sediment in portions of the Channel.

89.     Lake Erie water levels are dropping and are forecasted to continue to drop for the remainder of the 2016 shipping season, which will further exacerbate the impediment to navigation.

90.     Despite the facts that the sediment in the Upper Cuyahoga Navigation Channel is above project limits, that ships are forced to severely light load their holds, that AreclorMittal is at risk of shutting down for lack of raw materials, and that Lake levels are dropping, as of September 15, 2016, the Corps has refused to issue a contract to complete the 2016 Project under the pretext that the Harbor may not need to be dredged in 2016.

91.     Furthermore, the Corps' position that the Cleveland Harbor may not need to be dredged in 2016 is directly contradicted by the Corps' April 2016 notice to ship captains warning them that the sediment in the Cleveland Harbor is above project limits.

92.     Furthermore, the Corps has maintained that even if Cleveland Harbor needs to be dredged, the Corps will refuse to dredge unless someone else pays for disposal of the sediment in CDFs because the Corps believes that the contaminated sediment is safe to place into Lake Erie.

24

93.     The Corps' claim that the Cleveland Harbor does not need to be dredged in 2016 is false and merely a pretext for the Corps' previously issued ultimatum that either someone else pays for CDF disposal or the Corps will not dredge.

### Regulation of Disposal of Dredged Material

94.     While the Corps maintains its unsupported claim that its refusal to dredge is because the Cleveland Harbor does not need to be dredged, the real dispute between the parties is who regulates and pays for the disposal of the dredged material.

95.     Disposal of the dredged material from the Cleveland Harbor is regulated by the State of Ohio—under its Federally granted authority to protect its water quality, coastal zone, and submerged lands—and also by the Corps.

96.     The Ohio Environmental Protection Agency regulates the disposal of dredged material under its Federally-derived authority from the Clean Water Act, and the Ohio Department of Natural Resources regulates the disposal of dredged material in Ohio's coastal zone under Federally-derived authority from the Coast Zone Management Act.

97.     The Clean Water Act gives Ohio authority to require a State Water Quality Certification before entities are allowed to place any pollutant, including dredged material, into waters of the State.   Additionally, OHIO REV. CODE § 6111.04 prohibits the placement of pollutants into waters of the state without a permit from the Ohio EPA.  Dredged material is a pollutant pursuant to OHIO REV. CODE §§ 6111.01(A), (D).

98.     Additionally, U.S. EPA's regulations require compliance with State water quality standards before the discharge of dredge material is permitted. 40 C.F.R. § 230.10.

99.     The Coastal Zone Management Act requires Federal agency activities to be undertaken in a manner consistent to the maximum extent practicable with Ohio's Coastal Management Program.

### Contaminants in the Cleveland Harbor Sediment

100.     The two contaminants of greatest concern in the Cleveland Harbor sediments are (and have been) polychlorinated biphenyls ("PCBs") and polycyclic aromatic hydrocarbons ("PAHs").   Both contaminants are persistent carcinogenic toxins.   The exact source of contamination is unknown; however, these contaminants likely originated from industrial activities that occurred before the 1970s, and since then these legacy contaminants have been leaching into the sediment during storm events from combined sewer overflow discharges, contaminated stormwater runoff, and runoff from historic landfills and historic industrial sites.

101.     PCBs are a contaminant of concern because they are a toxic substance which is subject to bioaccumulation.   This means that once PCBs enter the food chain, they remain substantially intact and concentrate in greater amounts as they move through the food chain. Consequently, small organisms absorb the PCBs by living in contact with and consuming the contaminated sediment.   Each predator then consumes and retains PCBs that are in its prey.   This process results in the increased total amount of the PCBs in organisms that are higher up in the food chain.   Humans absorb PCBs by consuming fish or other wildlife that has absorbed PCBs from their prey.   In humans, PCBs are carcinogenic.

102.     PCBs are strongly resistant to biodegradation, taking centuries to degrade.   This means that once PCBs are placed in Lake Erie, those PCBs remain in the Lake for decades or longer, unless they are absorbed into the food chain.

103.    PAHs are a concern because they are both acutely and chronically toxic to organisms that live in the lake sediments and high enough concentrations of PAHs are lethal to these organisms.  Because these organisms serve as an important link in the aquatic food chain, the addition of high enough concentrations of PAHs has a detrimental effect on the Lake Erie ecosystem.  PAH contamination in the Cleveland Harbor is likely from both historic and current activities.  Sources of PAH contamination in the Cleveland Harbor include the release of petroleum products and the incomplete combustion of coal, oil, and gas.

104.    The parties disagree about whether the presence, concentration, and nature of these contaminants in the Upper Mile sediment would cause a violation of State water quality standards if the Corps were to place that sediment in Lake Erie.

### The Federal Standard Alternative for the Disposal of Dredged Material

105.    The Corps calls its determination of where and how it would prefer to dispose of dredged material the "Federal Standard" alternative or the "base plan."

106.    The Corps describes its Federal Standard policy as "the discharge of dredged or fill material into waters of the U.S. or ocean waters in the least costly manner, at the least costly and most practicable location, and consistent with engineering and environmental requirements." 33 C.F.R. § 335.4.

107.    The Corps' regulations define the Federal Standard as "… the dredged material disposal alternative or alternatives identified by the Corps which represent the least costly alternatives consistent with sound engineering practices and meeting the environmental standards established by the 404(b)(1) evaluation process or ocean dumping criteria."  33 C.F.R. § 335.7.

108.    The Corps asserts that after it has determined which dredged material disposal alternative constitutes the Federal Standard, it will not perform any other more costly alternative unless a non-Federal sponsor agrees to pay for the difference in cost.

109.    In 1998, the U.S. EPA and the Corps jointly developed the Great Lakes Dredged Material Testing and Evaluation Manual ("Great Lakes Testing Manual") in order to determine when it is environmentally acceptable to place dredged material in the Great Lakes.  Specifically, the Great Lakes Testing Manual provides sampling, testing, analysis, and evaluation procedures for determining whether open lake disposal of sediment is environmentally acceptable.  The Corps has historically always followed the Great Lakes Testing Manual when making determinations that involve the evaluation and disposal of dredged material into the Great Lakes.

110.    Prior to the development of the Great Lakes Testing Manual, the U.S. EPA and the Corps jointly developed a manual called the Inland Testing Manual, which serves as a general manual for determining when it is environmentally acceptable to place dredged material in inland lakes.  With regard to the evaluation of PCB bioaccumulation, the Inland Testing Manual refers to and instructs the use of regional manuals (i.e., the Great Lakes Testing Manual) for more region specific requirements.

### Corps' Sampling in 2012

111.    In 2012, the Corps sampled the Upper Mile sediment and Lake Erie sediment to perform a comparison, in order to assess whether open-Lake disposal would comply with U.S. EPA's 404(b)(1) guidelines.

112.    The Great Lakes Testing Manual at page 24 states that a "sediment sampling program … should collect samples that are representative of the materials to be dredged, and the sediments at the disposal site."  The Great Lakes Testing Manual at page 26 further states that

28

"[t]he selection of a disposal site sediment from areas of localized contamination, such as from spills or point discharges, in order to bias the dredged material evaluation is not acceptable."

113.   In 2012, the Corps collected samples from two locations in Lake Erie to compare that sediment to the Upper Mile sediment.  The Corps refers to the two Lake Erie locations as CLA-1 and CLA-4.

114.   CLA-1, the Corps' proposed open-Lake disposal location for the 2016 Project, is about one mile long by two miles wide and is located in Lake Erie's central basin.  CLA-1 is nine miles north of Cleveland (GPS coordinates: 41.645504988N, 81.726066535W).  The water at CLA-1 is about 62 feet deep.  CLA-1 is a site that the Corps used for the disposal of dredged material from the Cleveland Harbor over 45 years ago, which was prior to the enactment of the Clean Water Act.

115.   Upon information and belief, the Corps' decision to propose CLA-1 as a disposal location is also based on the Corps' erroneous claim that no significant amount of the dredged material deposited at CLA-1 will migrate out of the boundaries of CLA-1.

116.   CLA-4, which along with CLA-1, was a proposed disposal location for the 2015 Project, is 6.4 miles northwest of Cleveland (GPS coordinates: 41.553171131N, 81.822554593W).  The water at CLA-4 is about 55 feet deep.

117.   Upon information and belief, the Corps' prior disposal of dredged material at CLA-1 caused above average PCB contamination and projected bioaccumulation at CLA-1.  Upon information and belief, CLA-1 is also contaminated by an oil spill.

118.   CLA-1 (and sites immediately adjacent to it) have higher levels of PCB contamination and projected bioaccumulation than any other area in Lake Erie that the Corps has ever tested for disposal of dredged material from the Cleveland Harbor.  The prior contamination

at CLA-1 biases test results and disqualifies it as a Lake comparison site under the Great Lakes Testing Manual.

119.    The Inland Testing Manual prohibits using Lake sediment as a reference sediment if it has been impacted by the prior disposal of dredged material.  Thus, the Inland Testing Manual would disqualify the Corps' use of either CLA-1 or CLA-4 as reference sediment.

120.    Additionally, when sampling the CLA-1 sediment in 2012, the Corps only collected and analyzed one composite sediment sample, which the Corps claims is representative of two square miles of the Lake bed.

121.    When sampling the Upper Cuyahoga Navigation Channel sediment in 2012, the Corps only collected surficial sediment samples (only to a depth of a few inches) and only from the center of the River.  Additionally, in 2012 the Corps only collected and analyzed one composite sediment sample from each of the three Upper Cuyahoga Navigation Channel DMMU segments, purportedly representing the total 180,000 cubic yards of material to be dredged.

## Corps' Evaluations of the Upper Mile sediment in 2013

122.    In 2013, the Corps assessed data from its 2012 sampling and testing according to the Great Lakes Testing Manual and the Inland Testing Manual.

123.    As part of this evaluation, the Corps documented the presence of contaminants of concern, including PCBs, in the Upper Mile sediment.

124.    The Great Lakes Testing Manual sets forth a four-tiered evaluation process, which allows the Corps to make a determination after any Tier that produces conclusive results, but which allows the Corps to proceed to the next Tier when results are inconclusive.

125.    Tier 1 involves the evaluation of sediment using historic data.  Tier 2 includes an evaluation of sediment using chemical analysis.  Tier 3 includes an evaluation of sediment using

30

biological testing.  Tier 4 involves case-specific testing and evaluation to resolve conflicting or inconclusive results generated by Tiers 1-3.

126.    With regard to PCB bioaccumulation, the Great Lakes Testing Manual at Tier 3 on page E-18 provides that:

> Dredged material is considered **not** to meet the [US EPA's 404(b)(1) regulations] when the mean concentration of bioaccumulative contaminant(s) in test organisms exposed to the dredged material is statistically greater than the concentration of these contaminant(s) in test organisms exposed to the disposal site sediment.

(emphasis in original).

127.    Tier 4 is used only when "the information provided by Tiers 1-3 is not sufficient to make a contaminant determination."  *Great Lakes Testing Manual*, page 10.  The Great Lakes Testing Manual at pages 46-47 directs the Corps, when preforming a Tier 4 analysis, to use "bioaccumulation tests which differ from Tier 3 in both level of intensity and cost."  As an essential part of Tier 4, the Corps must "coordinat[e] with other agencies up front" regarding that testing and evaluation.  Furthermore, Tier 4 testing "should be focused on contaminant issues not resolved in earlier tiers," and bioaccumulation results which failed at Tier 3 should not be reevaluated at Tier 4 in an attempt to change the contaminant determination.

128.    The Corps' 2013 evaluation demonstrated that the mean concentration of bioaccumulative PCBs in test organisms exposed to the Upper Mile sediment was statistically greater than the concentration of these PCBs in test organisms exposed to the sediments from CLA-1 and CLA-4.

129.    As a result, Tier 3 of the Great Lakes Testing Manual would prohibit open-Lake disposal of the Upper Mile sediment.

130.    However, in 2013, for the first time since the development of the Great Lakes Testing Manual, when evaluating sediment from any Ohio harbor for the placement in Lake Erie, the Corps determined that the Tier 3 biological testing was inconclusive.  The Corps' analyses of all previous sample sets from the Cleveland Harbor had excluded open-Lake disposal of dredged material without going any further than Tier 3.

131.    For the first time in 2013, after failing at Tier 3, which should have been conclusive per the Great Lakes Testing Manual, the Corps claims to have applied a new standard and a new test that neither qualifies as Tier 3 nor Tier 4.  The Corps asserts that the new standard (referred to by the Corps as the "ASTM guideline") allows open lake disposal of sediment that has 100% more PCB bioaccumulation than lake reference sediment.

132.    The new test that the Corps used is mathematical model which the Corps calls the Spatially Explicit Screening Level Exposure Comparison ("SESLEC") model.  This model is published only in a draft guidance document and, at the time the Corps attempted to use it, had neither been peer-reviewed nor approved by U.S. EPA or other regulatory agencies for use in making contaminant determinations for sediment disposal.

133.    The Corps, without authority in regulation, guidance, or past practice, decided to use the purported ASTM guideline and SESLEC model after failing at Tier 3 and before reaching Tier 4 as a newly-contrived intermediate step.  However, not only did the Corps inappropriately use the SESLEC model to evaluate the Upper Mile sediment, **the Corps specifically changed the wording of the SESLEC model in order to justify open-Lake disposal of the Upper Mile sediment**.

134.    The Corps claimed to have made its Federal Standard determination on December 17, 2014, based on the 2013 evaluation.

**Further Sampling and Evaluations
of the Upper Mile sediment by the Corps**

135.    In June and November of 2014, and again at various times in 2015, the Corps

performed additional sampling of Cleveland Harbor and Lake Erie sediments.  The Corps

performed PCB bioaccumulation tests and PAH toxicity tests on these samples.  The Corps did

not consider these data for what it claims to be its December 2014 Federal Standard

determination.

136.    The Corps has not made a new Federal Standard determination since evaluating

the 2014 and 2015 data.

137.    On November 20, 2015, the Corps formalized its analysis of data from its 2014

testing in a document titled "Dredged Sediment Evaluation."  On February 24, 2016, the Corps

formalized its analysis of data from its 2015 testing in a document titled "Revised Dredged

Sediment Evaluation."  The Corps did not consider the results of either analysis for what it

claims to be its December 2014 Federal Standard determination, nor has the Corps made a new

Federal Standard determination since evaluating these data that would apply to the 2016 Project.

138.    Even though the Upper Mile sediment would fail Tier 3 of the Great Lakes

Testing Manual and no Tier 4 analysis was performed, the Corps claims that its 404(b)(1)

analysis of the 2015 data would allow the Upper Mile sediment to be placed in Lake Erie at

CLA-1.

139.    The Corps' 2015 data—in contrast to the Corps' conclusions—actually

demonstrate that the Upper Mile sediment is more polluted than Lake Erie background

conditions.  Specifically, the Corps' 2015 data demonstrate that the Upper Mile sediment

bioaccumulates between 60% to 90% more PCBs than the sediment from CLA-1. It also

33

demonstrates that the Upper Mile sediment bioaccumulates almost 400% more PCBs than Lake Erie background conditions.  The 2015 data show that the Upper Mile sediment would cause even more pollution if placed in Lake Erie than the 2012 data had originally shown.  Therefore, open-Lake disposal would not be permitted under the Great Lakes Testing Manual, which only allows open-Lake disposal if there is a 0% increase in PCB bioaccumulation.  As in 2013, rather than following the Great Lakes Testing Manual, the Corps justifies open-Lake disposal by inappropriately applying the ASTM guideline—which the Corps incorrectly claims allows for a doubling of PCB bioaccumulation.

140.    Despite the Corps' receipt and evaluation of this new information, the Corps has not made a new Federal Standard determination.

### Ohio EPA's Sampling and Evaluation
### of the Upper Mile sediment

141.    Ohio EPA performed its own sampling on the Cleveland Harbor and Lake Erie sediment in 2014.  Ohio EPA performed PCB bioaccumulation tests and PAH toxicity tests on the samples collected in accordance with U.S. EPA-approved protocols.  The results of these data mirror the results from the Corps' 2015 data in that the Upper Mile sediment is significantly more polluted than the Lake sediment because there is a greater amount of PCB bioaccumulation in the Harbor sediments than in the Lake sediments.

142.    Ohio EPA shared its initial data with the Corps on July 22, 2015, and its complete data set on September 30, 2015.

143.    The Corps refused to consider Ohio EPA test results, incorrectly claiming that Ohio EPA followed the wrong procedures in its PCB bioaccumulation sampling and testing.  However, Ohio EPA followed the most recent U.S. EPA-approved PCB bioaccumulation

34

sampling and testing procedures.  Furthermore, the testing procedures that the Corps claimed invalidated Ohio EPA's 2015 data were the same testing procedures that the Corps itself used for some of its own 2014 Lake Erie PCB bioaccumulation testing.

144.    Despite the fact that all Corps and Ohio EPA evaluations demonstrate that the Upper Mile sediment is more polluted than both Lake Erie background conditions and CLA-1, the Corps believes it is environmentally acceptable to place the Upper Mile sediment into Lake Erie and refused to consider Ohio EPA's data or analyses.

145.    The Corps' 2013, 2014, and 2015 analyses and Ohio EPA's analyses all indicate that the Upper Mile sediment contains PCBs and that the PCBs would be biologically available to living organisms in Lake Erie during and after the proposed open Lake disposal.

146.    The Corps' 2013, 2014, and 2015 analyses and Ohio EPA's analyses of the CLA-1 sediment indicate that CLA-1, after having been compromised by the Corps' previous dumping and other contamination, is not representative of existing background conditions of the Central Basin of Lake Erie.

147.    Additionally, the Corps' 2013, 2014, and 2015 analyses and Ohio EPA's analyses of the sediment at CLA-1 indicate that use of the CLA-1 sediment for comparison to Upper Mile sediment would not be permitted under the procedures of the Great Lakes Testing Manual or Inland Testing Manual.

148.    If the Corps places the Upper Mile sediment at CLA-1, significant amounts of the Upper Mile sediment would migrate from the boundaries of CLA-1.

149.    The Upper Mile sediments, if placed at CLA-1, would cause an increase in PCB bioaccumulation and/or an increase in PCB contamination.

**State Water Quality Certification and**

## Coastal Zone Management Act Consistency Determination

150.    Under the Clean Water Act, before a permit can be issued to dispose of dredged material into waters of a particular state, that state must grant the applicant a certification stating that the disposal of dredged material will not harm that state's water quality.  This certification is a called a State Water Quality Certification (or a 401 certification).

151.    The Director of the Ohio EPA has the authority to issue state water quality certifications.  OHIO REV. CODE § 6111.03(P); OHIO ADM. CODE § 3745-32.

152.    On November 20, 2015, the Corps applied to the Director of Ohio EPA for an Ohio Water Quality Certification for discharges of dredged material associated with the scheduled 2016 Project.  The Corps sought a certification from the Ohio EPA that the discharges of dredged material associated with the scheduled 2016 Project would comply with applicable state water quality standards pursuant to Section 401 of the Clean Water Act.

153.    More specifically, in its Ohio Water Quality Certification application, the Corps included three alternatives for the 2016 Project, in accordance with Ohio's Antidegradation Rule, OHIO ADM. CODE § 3745-1-05.   In its antidegradation submittal, the Corps dismissed two of those proposed alternatives on its own: dredging 375,000 cubic yards of sediment and dredging no sediment at all.   In its application, the Corps identified what it determined to be "the minimum degradation alternative" as the dredging of a total of 225,000 cubic yards of dredged material from the Cleveland Harbor, with 45,000 cubic yards placed into an existing CDF and 180,000 cubic yards to go to the open-Lake disposal area identified as CLA-1.

154.    Pursuant to OHIO ADM. CODE § 3745-32-05, the Director of the Ohio Environmental Protection Agency cannot grant a water quality certification unless the Director

determines that the applicant has demonstrated that the discharge of dredged material to waters of the state will not do the following:

(1) Prevent or interfere with the attainment or maintenance of applicable water quality standards.
(2) Result in a violation of any applicable provision of the following sections of the Clean Water Act:
    (a) Effluent limitations as described in section 301.
    (b) Water quality related effluent limitations as described in section 302.
    (c) Water quality standards and implementation plans as described in section 303.
    (d) National standards of performance as described in section 306.
    (e) Toxic and pretreatment effluent standards as described in section 307.

155.    Additionally, the Director of the Ohio EPA may not issue a water quality certification for any harbor or navigation maintenance activities proposing to deposit dredged material in any part of Lake Erie unless the Director has determined that "the dredged material will not result in a modeled increase in 'bioaccumulation' of a 'bioaccumulative chemical of concern' as those terms are defined in 3745-1-02 of the Administrative Code."  OHIO ADM. CODE § 3745-32-05.

156.    PCBs are defined as a bioaccumulative chemical of concern under OHIO ADM. CODE § 3745-1-02(B)(13).

157.    Bioaccumulation is defined as "the net accumulation of a substance by an organism as a result of uptake from all environmental sources" under OHIO ADM. CODE § 3745-1-02(B)(11).

158.    As part of Ohio's water quality standards and as required by the Clean Water Act and U.S. EPA's regulations, Ohio has established an antidegradation policy and review process. OHIO REV. CODE § 6111.12; OHIO ADM. CODE § 3745-1-05; 33 U.S.C. § 1313(d)(4);  40 C.F.R. § 131.12  ("The State shall develop and adopt a statewide antidegradation policy [which] shall, at a minimum be consistent with the following … [water] quality shall be maintained and protected

unless the State finds … that allowing lower water quality in necessary to accommodate important economic or social development.")

159.    Ohio's antidegradation rules prohibit the lowering of existing water quality of any water of the State unless the Director of Ohio EPA determines that lowering water quality is necessary to accommodate important social or economic development when considering the technical and economic feasibility of non-degradation and minimal degradation alternatives. OHIO ADM. CODE § 3745-1-05(C).  Pursuant to OHIO ADM. CODE § 3745-1-05(B)(1)(c), before the Director of Ohio EPA can issue a water quality certification, an applicant must satisfy Ohio EPA's antidegradation requirements.

160.    Ohio's antidegradation rules specifically address the disposal of bioaccumulative chemicals into Lake Erie.  OHIO ADM. CODE § 3745-1-05(F).  Any increased loading of bioaccumulative chemicals into Lake Erie is specifically defined as a significant lowering of water quality.  OHIO ADM. CODE § 3745-1-05(F).  Any entity seeking to significantly lower water quality in this manner must submit to the Ohio EPA an antidegradation demonstration that identifies alternatives that could eliminate the need to increase loading of bioaccumulative chemicals into Lake Erie.

161.    On March 22, 2016, the Director of Ohio EPA granted a Water Quality Certification that permits the Corps to dredge the Cleveland Harbor and dispose of the dredged material in CDFs 9, 10B, or 12, but expressly prohibits open-Lake placement of any dredged material from the Cleveland Harbor.

162.    Although it had the right to do so under Ohio law, the Corps did not appeal the 2016 Water Quality Certification.

38

163.    Pursuant to the CZMA, all Federal activities that have reasonably foreseeable effects on the coastal zone must be conducted in a manner that is "consistent to the maximum extent practicable" with the enforceable policies of the State's Federally-approved Coastal Management Program ("CMP").  16 U.S.C. § 1456(c)(1)(A).

164.    Pursuant to 16 U.S.C. § 1453(1), "the [coastal] zone extends, in Great Lakes waters, to the international boundary between the United States and Canada ...."  Therefore, Ohio's Coastal Zone extends north within Lake Erie's Central Basin to the international boundary between the United States and Canada and includes CLA-1 and CLA-4.

165.    Pursuant to OHIO REV. CODE § 1506.02(A), the Ohio Department of Natural Resources has been designated by the Ohio General Assembly to develop and implement Ohio's CMP.

166.    The National Oceanic and Atmospheric Administration ("NOAA") approved the most recent version of Ohio's CMP in April of 2007.

167.    On February 11, 2015, Ohio established new rules related to Ohio's water pollution control program under OHIO ADM. CODE § 3745-32-05, adopted in accordance with the Ohio Governor's Executive Order 2015-02K.

168.    On February 11, 2015, pursuant to 16 U.S.C. §1456(f), the Program Change Guidance issued by NOAA in July 1996, and the November 2013 Addendum to that 1996 Program Change Guidance, ODNR gave notice of incorporation of the new requirements of Ohio's water pollution control program found in OHIO ADM. CODE § 3745-32-05 into the Ohio CMP.

169.    On February 13, 2015, NOAA acknowledged the incorporation of Ohio's changes to OHIO ADM. CODE § 3745-32-05 into Ohio's CMP.

170.    The Corps' 2016 Project must comply with Ohio's Federally-approved CMP to the maximum extent practicable because the Corps' designated open Lake disposal locations are within Ohio's coastal zone.

171.    On November 20, 2015, the Corps submitted a consistency determination to the ODNR for the 2016 Project.

172.    The Ohio Department of Natural Resources had the option of concurring with, conditionally concurring with, or objecting to the Corps' determination that the 2016 Project would be consistent with Ohio's CMP.  15 C.F.R. § 930.4; 15 C.F.R. §§ 930.41-.46.

173.    Pursuant to Enforceable Policy 6 of Ohio's Federally-approved CMP, Part II 5-24,  "it is the policy of the State of Ohio to maintain and improve the quality of the state's coastal waters for the purpose of protecting the public health and welfare and to enable the use of such waters for public water supply, industrial and agricultural needs, and propagation of fish, aquatic life and wildlife by … regulating discharge of dredge or fill material into surface waters … in accordance with section 401 of the Clean Water Act (O.R.C. 6111.03)."  Enforceable Policy 6 further provides at Ohio's Federally-approved CMP Part II 5-29 that "rules that, in part, set forth criteria for Section 401 Water Quality Certification are contained in O.A.C. Chapter 3745-32."

174.    Pursuant to Ohio's Federally-approved CMP, Part II 5-68, "Dredging involves large quantities of material that are very costly to remove and may pose environmental problems. Polluted materials must be disposed at approved upland sites or in confined disposal facilities."

175.    Pursuant to Enforceable Policy 17 of Ohio's Federally-approved CMP, Part II 5-73, it is the policy of the State of Ohio to provide for the dredging of harbors, river channels and other waterways and to protect the water quality, public right to navigation, recreation and natural resources associated with these waters in the disposal of the dredged material by …

40

regulating, through the Ohio Environmental Protection Agency Water Quality Certification, the discharge or disposal of dredged material.  (OHIO REV. CODE § 6111.03(P) and OHIO ADM. CODE Chapter 3745-1).  Enforceable Policy 17 further provides: "Before any agency or individual disposes of dredged material into Ohio waters, a state water quality certification must be obtained."

176.    Pursuant to Enforceable Policy 27 of Ohio's Federally-approved CMP, Part II 5-101, "it is the policy of the State of Ohio to assure the continual enjoyment of the benefits received from the fisheries of Lake Erie and to maintain and improve these fisheries by … protecting fish habitat through Ohio EPA's Section 401 Water Quality Certification authority (O.R.C. 6111.03(O) and 6111.03(P) and O.A.C. 3745-1 and 3745-32)."  Enforceable Policy 27 further provides: "Biological criteria are considered in water quality standards, and the antidegradation policy is used to protect state resource waters from degradation. Therefore, a Section 401 certification may be denied for sufficient grounds to protect important aquatic life uses of Lake Erie and coastal area waters.  Special conditions of Section 401 certifications may be imposed on activities."

177.    Pursuant to Enforceable Policy 33 of Ohio's Federally-approved CMP, Part II 5-119, "it is the policy of the State of Ohio to protect the visual and aesthetic amenities of Lake Erie and its shoreline to enhance the recreational, economic, cultural and environmental values inherently associated with the coastal area by … enforcing State Water Quality Standards. (O.R.C. Chapter 6111, O.A.C. 3745-1-04)."

178.    On January 25, 2016, ODNR issued a conditional concurrence with the Corps' consistency determination for the 2016 Project including conditions that "A section 401 Water Quality Certification, or waiver thereof, must be received from the Ohio EPA pursuant to Ohio

41

Revised Code § 6111.03.  The project must be carried out in a manner consistent with all conditions contained in the Certification."  The conditional concurrence explained that the conditions within it were necessary to allow its concurrence by insuring consistency with Ohio CMP Enforceable Policies "#6 (Water Quality), #17 (Dredging and Dredged Material Disposal), #27 (Fisheries Management), and #33 (Visual and Aesthetic Quality) as applicable in 2015."

179.    The State Water Quality Certification from the Director of the Ohio EPA does not allow the Corps to place the dredged material from the 2016 Project in the open waters of Lake Erie.  Therefore, to be consistent with Ohio's Federally-approved CMP to the maximum extent practicable, the Corps must dispose of the dredged material in a location other than Lake Erie.  As a result, if the Corps were to place the dredged material in Lake Erie, the Corps would be in violation of the CZMA.  To be consistent with Federal law, including the CZMA, as well as with State law and rules, the Corps must choose a disposal location other than Lake Erie.  The only other disposal locations identified as available are CDFs 9, 10B and 12.

### Underfunding the 2016 Project

180.  The Corps is funded through the annual Federal appropriations process.  For 2016, the Corps received its 2016 harbor operation and maintenance funding pursuant to the Consolidated Appropriations Act, 2016, PL 114-113, December 18, 2015, 129 Stat 2242.

181.  The President submits his budget recommendations to Congress to initiate and guide the federal appropriations process.

182.    Before the President finalizes his budget recommendations, federal agencies, including the Corps, provide budget recommendations to the Office of Management and Budget ("OMB").

183.    Upon information and belief, in 2015, before the Complaint challenging the Corps' 2015 Project was filed in case number 15CV00679, the Corps submitted a budget request to OMB recommending $6,700,000 for dredging of the Cleveland Harbor in 2016.  This sum was sufficient to dredge the full Cleveland Harbor and place all of the dredged material into CDFs.

184.    Upon information and belief, OMB approved the Corps' request for $6,700,000 for maintenance dredging of the Cleveland Harbor in 2016 and incorporated this amount in the President's budget, which was then submitted to Congress.

185.    Upon information and belief, while the Corps' 2016 budget was being considered in the House Appropriations Committee, the Corps presented an operation and maintenance work plan that included $6,700,000 for dredging of the Cleveland Harbor.

186.    Upon information and belief, on or about December 17, 2015, despite this Court's issuance of its Preliminary Injunction in Case No. 15CV00679 requiring the Corps to maintain the status quo by disposing all of the Cleveland Harbor dredged material in CDFs, the Corps submitted into the Congressional Record (House of Representatives) a revised work plan that reduced the 2016 Cleveland Harbor dredging budget from $6,700,000 to $2,800,000, creating the appearance that disposal in the open waters of Lake Erie is the only alternative that the Corps has sufficient funds to implement.

187.    Based on the Corps' reduction in allocations for dredging of the Cleveland Harbor for 2016 and the authority under the Consolidated Appropriations Act of 2016, the Corps designated only $2,800,000 within its operation and maintenance budget for the dredging of Cleveland Harbor in 2016.

188.    The reduced allocation of $2,800,000 for dredging in 2016 appears to be insufficient for the Corps to dredge in compliance with Ohio's 2016 Water Quality Certification

and appears to be insufficient for the Corps to dispose of the dredged material in CDFs at Federal expense.

189.    However, on April 1, 2016, the Commander of the Great Lakes and Ohio River Division of the Corps stated in a press release that:  "It remains possible that the federal cost of dredging Cleveland Harbor in 2016 may exceed the current budgeted amount of $2.8 million.  If additional funds are required for any dredging project, the Corps would seek the difference in funding from an appropriate source within the Corps' Operations and Maintenance (O&M) program."

190.    When the Corps intentionally reduced its requested allocation for Cleveland Harbor dredging in 2016, the Corps knew that decisions regarding the proper disposal of the dredged material from the Cleveland Harbor would still be pending with this Court.  Moreover, the Corps knew that this Court had ordered all dredged materials from Cleveland Harbor to be disposed in a CDF at full Federal expense.

191.    Upon information and belief, the Corps requested that Congress reduce the appropriations for dredging of the Cleveland Harbor in 2016 in an attempt to avoid having to pay for compliance with Ohio's Water Quality Certification for the 2016 Project as this Court had ordered the Corps to do for the 2015 Project (pending resolution of that case).

## CLAIMS FOR RELIEF

### COUNT I
### Declaratory and Injunctive Relief Pursuant to 5 U.S.C. §§ 701-706
### (Violation of the Clean Water Act)

192.    Plaintiffs hereby incorporate and reassert the foregoing paragraphs of the Complaint.

193.   The Clean Water Act requires Federal agencies to comply with all state laws "respecting the control and abatement of water pollution."  33 U.S.C. § 1323(a).

194.   The Clean Water Act further requires Federal agencies to comply with state environmental laws when they engage in activities that discharge pollutants into navigable waters. 33 U.S.C § 1344(t); 33 U.S.C. § 1323(a).

195.   Federal agencies are required to obtain certifications from the states in which the agencies discharge pollutants into navigable waters.  33. U.S.C. § 1341(a)(1).

196.   Ohio's water pollution control laws require that dischargers obtain a permit before placing pollutants into waters of the State.  OHIO REV. CODE § 6111.04.  Dredged material is a pollutant under OHIO REV. CODE §§ 6111.01(A) and (D).

197.   Even as a Federal agency, the Corps has an obligation to obtain water quality certifications from Ohio EPA for the 2016 Project, to comply with the water quality standards of Ohio, and to comply with any conditions Ohio lawfully imposes for compliance with State standards when conducting and maintaining the 2016 Project.

198.   Despite this clear statement of the law, the Corps has declared that Ohio lacks authority under the Clean Water Act to determine whether disposal of PCBs into Lake Erie violates Ohio's water quality standards.

199.   The Corps' incorrect determination that Ohio is without authority to deny authorization for the discharge of dredged material for the 2016 Project is evidenced by the Corps' claim that open-Lake disposal is the Federal Standard.

200.   The Corps' determination that the Federal Standard is open-Lake disposal of the Upper Mile sediment in the absence of an Ohio Water Quality Certification authorizing such

disposal in Lake Erie is arbitrary and capricious, an abuse of discretion, and not in accordance with law.

201.   Based on the Corps' assertion that Ohio lacks authority under the Clean Water Act to prohibit the Corps' discharge of dredged material into Lake Erie, the Corps is demanding that Ohio or another non-Federal sponsor pay to place the Upper Mile sediment in a CDF.

202.   The Corps' determinations and actions in accordance with those determinations violate the Clean Water Act and constitute a final agency action reviewable by this Court pursuant to the APA, 5 U.S.C. § 704.

203.   The State of Ohio and the Port have suffered a legal wrong or have been adversely affected or aggrieved by the Corps' actions.  5 U.S.C. § 702.

**COUNT II**
**Declaratory and Injunctive Relief Pursuant to 5 U.S.C. §§ 701-706**
**(Failure to Prepare an Environmental Impact Statement and other NEPA violations)**

204.   Plaintiffs hereby incorporate and reassert the foregoing paragraphs of the Complaint.

205.   The National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4332(2)(C), requires all agencies of the Federal government to prepare an environmental impact statement ("EIS") on all major Federal actions significantly affecting the quality of the human environment. For such actions, the Federal agency is required to rigorously and objectively evaluate all reasonable alternatives.

206.   The Council on Environmental Quality ("CEQ") has promulgated regulations to guide Federal agencies in determining what actions are subject this statutory requirement at 40 C.F.R. § 1500.3.  Furthermore, the Corps has adopted regulations, codified at 22 C.F.R. §§ 230.1 *et seq.*, to guide its implementation of NEPA.  The Corps' regulation, at 33 C.F.R. § 230.6,

indicates that proposed major changes to projects, increasing size or adding additional purposes, ordinarily call for the preparation of an EIS.

207.    The CEQ regulations allow a Federal agency to prepare a more limited Environmental Assessment ("EA") only if the agency correctly determines that the proposed action will not significantly affect the quality of the human environment.  42 U.S.C. § 4332(C).

208.    If a Federal agency, when performing an EA, determines that agency actions will not have a significant effect on the human environment, the agency must issue a Finding of No Significant Impact ("FONSI").  40 C.F.R. §§ 1501.4(e), 1508.13.

209.    Where the effects on the human environment are "highly uncertain or involve unique or unknown risks," however, an agency must prepare an EIS.  40 C.F.R. § 1508.27(b)(5).

210.    The dredging of the Upper Cuyahoga Navigation Channel and the deposit of the Upper Mile sediment into Lake Erie is a major Federal action within the meaning of NEPA.

211.    Due to the toxic contamination in the dredged material, virtually every year since the passage of the Clean Water Act the Corps has disposed all dredged material from the Upper Mile sediment in nearby CDFs.

212.    On December 18, 2014 the Corps issued an EA and a FONSI in which it indicated that it would begin the open-Lake disposal of the Upper Mile sediment in the 2015 work season. The Corps claimed that the proposed maintenance activity was limited in scope and "not a major federal action," thus finding that no further analysis of the environmental impact of the 2015 Project via an EIS was necessary.

213.    In preparing its December 18, 2014 EA and FONSI, the Corps failed to adequately consider the cumulative impacts of disposing of contaminated dredged material in Lake Erie.   Specifically, the Corps failed to consider all available data regarding the

47

contamination of the Upper Mile sediment with persistent carcinogenic contaminants. The Corps also failed to consider the viable alternatives with respect to disposal at CDFs operated by the Port.

214. In addition, the Corps admitted that there would be an increase in PCB contamination and bioaccumulation from the physical process of dumping the dredged material into the Lake. This is caused by some plumes of sediment remaining suspended after the dredged material is released from the barge into the open Lake. However, the Corps failed to consider the effect that dumping multiple loads of sediment multiple times during the annual projects will have on the environment. The Corps must evaluate this impact because dredging operations take multiple months to complete and occur two times per year. Because these Projects occur annually, the suspended plumes of sediment will remain in the Lake for multiple weeks throughout every year. The Corps failed to evaluate the cumulative impacts of these PCB-contaminated plumes.

215. Therefore, the Corps admitted that open-Lake disposal of the dredge sediment would increase available PCB contamination, and thereby increased bioaccumulation of PCBs in the environment, but failed to consider those facts when it determined that there would be no significant impact.

216. Additionally, the Corps failed to adequately consider the impact that placing PCB-contaminated sediment in the Lake every year would have on the environment. If the Corps places the dredged material in the Lake every year, as it has now claims the Federal Standard to be, there is a cumulative increase in the total amount of PCBs in the Lake. Additionally, the mound created by placing the PCB-contaminated sediment in the same disposal location will become larger every year. The Corps' only explanation of this impact is an

48

inexplicable and unsubstantiated summary prediction that "it is expected that all the sediment from the Federal navigation channels will likely become suitable for open-lake placement in the future." The Corps has ignored the scientific evidence of the cumulative impacts caused by placing dredged material, known to contain PCBs, into the Lake on an annual basis.

217. The Upper Mile sediment does not meet Federal "contaminant determination" guidelines for open-lake placement pursuant to 40 C.F.R. § 210.11[d]. The material further does not meet Ohio's water quality standards pursuant to OHIO ADM. CODE § 3745-1-05, and it does not meet the requirements of OHIO ADM. CODE § 3745-32-05. Ohio EPA therefore could not and did not certify that disposal of the Upper Mile sediment in Lake Erie complied with State water quality standards and would not allow it to be placed at an open Lake area.

218. The Corps did not gather sufficient data by which to fully evaluate the impact of the disposal of the Upper Mile sediment in the Lake.

219. The Corps improperly evaluated the data it did gather to reach its preferred conclusion of open-Lake disposal, including the improper application of the Great Lakes Testing Manual, the use of the SESLEC model, the manipulation of the SESLEC model, and the failure to consider the data and analyses provided by Ohio EPA.

220. The Corps' determination that disposing of the PCB-contaminated sediment into Lake Erie would be permissible without preparing an EIS, without further analysis of the suitability of this material for open-Lake placement, without sufficient analysis of the impacts of bioaccumulation on the already impacted Lake, and without adequate information regarding the migration of the deposited sediment to other regions of the Lake violates NEPA, and is arbitrary, capricious, and not in accordance with the law.

49

221.    The Corps' determination that disposing of PCB-contaminated sediment into Lake Erie would cause no significant impact violates NEPA and is arbitrary, capricious, and not in accordance with the law.

222.    In addition to its failure to prepare an EIS, the Corps failed to evaluate the very alternative it now proposes—deferring to dredge Cleveland Harbor.  Deferring dredging of Cleveland Harbor (or the Upper Channel) is a substantial change to the Corps' past dredging practices, and it is required to evaluate this alternative pursuant to NEPA.

223.    The Corps' failure to evaluate its proposed alternative (deferring dredging) violates NEPA and is arbitrary, capricious, and not in accordance with law.

224.    The Corps' failure to prepare an EIS and its failure to evaluate its proposed alternative (deferring dredging) are subject to review by this Court under the APA.  5 U.S.C. §§ 551(13), 701 and 704.

225.    When performing its EA, the Corps incorrectly concluded that a FONSI was acceptable in lieu of an EIS and failed to evaluate its proposed alternative (deferring dredging). These decision are subject to review by this Court under the APA.  5 U.S.C. §§ 551(13), 701 and 704.

226.    Additionally, the Corps failed to perform a new EIS or even perform a new EA and FONSI for its major modification to the project in 2016 in which it purports to remediate CLA-1 by placing contaminated sediment on top of it.   The Corps needed to perform a new EA to evaluate the environmental effects of its proposal to use the dredge material to remediate a portion of Lake Erie already contaminated by the Corps' previous open-Lake dumping.

227.   The State of Ohio, the Port, Ohio citizens, and the environment within Ohio have suffered a legal wrong or have been adversely affected or aggrieved by the Corps' failure to prepare an Environmental Impact Statement for a Federal action.  5 U.S.C. § 702.

## COUNT III
## Declaratory and Injunctive Relief Pursuant to 5 U.S.C. §§ 701-706
## (Violation of the Coastal Zone Management Act)

228.  Plaintiffs hereby incorporate and reassert the foregoing paragraphs of the Complaint.

229.   The Corps' 2016 Project is required to be consistent to the maximum extent practicable with Ohio's Federally-approved Coastal Management Program ("CMP").

230.   The Ohio Department of Natural Resources determined that the disposal of PCB-contaminated sediment in the open waters of Lake Erie would be consistent with Ohio's Federally-approved CMP only if the Corps obtained and complied with a State Water Quality Certification from the Ohio EPA.

231.  For the 2016 Project, the Ohio EPA granted the Corps a Water Quality Certification with conditions including the following:  1) "All dredged material shall be disposed of in CDF 9, 10B or 12;" and 2) "No open lake placement of dredged material is authorized with this Certification."

232.   Therefore, disposal of the Upper Mile sediment into Lake Erie would violate the CZMA.

233.   The Corps' determination that the Federal Standard for the 2016 Project includes open-Lake disposal of the Upper Mile sediment is arbitrary and capricious, an abuse of discretion, and not in accordance with the CZMA.

234.   The State of Ohio, the Port, Ohio citizens, and the environment have suffered a legal wrong or have been adversely affected or aggrieved by the Corps' decision that the Corps can dispose the Upper Mile sediment, which is contaminated with PCBs, in the open waters of Lake Erie in violation of the CZMA.  5 U.S.C. § 702.

**COUNT IV**
**Declaratory and Injunctive Relief Pursuant to 5 U.S.C. §§ 701-706**
**(Violation of the Federal Standard Regulations and US EPA's 404(b)(1) Regulations)**

235.   Plaintiffs hereby incorporate and reassert the foregoing paragraphs of the Complaint.

236.   Pursuant to its regulations, the Corps is required to manage dredged material "in the least costly manner, at the least costly and most practicable location, and consistent with engineering and environmental compliance."  33 C.F.R. § 335.4.  The Corps refers to the disposal alternative that satisfies this regulation as the "Federal Standard."

237.   The Corps' regulations more specifically define the Federal Standard as "… the dredged material disposal alternative or alternatives identified by the Corps which represent the least costly alternatives consistent with sound engineering practices and meeting the environmental standards established by the 404(b)(1) evaluation process …."  33 C.F.R. § 335.7.

238.   The Corps has determined that the Federal Standard must be the lowest cost alternative that satisfies the following two criteria:  1) environmentally acceptable and 2) in accord with sound engineering.  However, a prerequisite of determining and implementing the Federal Standard is that the chosen alternative must also be an alternative that the Corps is legally permitted to undertake.  A regulation cannot allow the Corps to undertake an activity in violation of Federal or applicable state law.

239.   Therefore, the Federal Standard alternative must be an alternative that is:   1) environmentally acceptable; 2) in accord with sound engineering; and 3) permitted under Federal law.  The Corps can then choose the least costly alternative that satisfies these criteria.

240.   The Corps' dredged materials management decisions and practices are subject to review by this Court under the APA.  5 U.S.C. §§ 531(13), 701 and 704.

241.   Without a sufficient factual or legal basis, the Corps has unilaterally decided that disposal of the Upper Mile sediment, which is contaminated with PCBs and PAHs, in into Lake Erie is environmentally acceptable for the 2016 Project.

242.   Open-Lake disposal of PCB-contaminated sediment cannot lawfully be the Federal Standard because the Corps has failed to demonstrate that disposing of the Upper Mile sediment in the open Lake would not cause an increase in PCB contamination and bioaccumulation and has failed to justify the discharge in accordance with Ohio's antidegradation rule found in OHIO ADM. CODE § 3745-1-05, which is Federally enforceable.

243.   Open-Lake disposal of the Upper Mile sediment cannot lawfully be the Federal Standard because the Corps failed to formally change the Federal Standard by failing to make a formal Federal Standard determination in a Preliminary Assessment or Dredged Material Management Plan.  The most recent formal Federal Standard determination, which was made prior to December 17, 2014, is CDF disposal of the Upper Mile sediment.  Therefore, the Federal Standard remains CDF disposal of the Upper Mile sediment.

244.   Open-Lake disposal of the Upper Mile sediment cannot lawfully be the Federal Standard because the Corps violated its own regulations and U.S. EPA's 404(b)(1) guidelines in concluding that the open-Lake disposal was the Federal Standard for reasons including, but not limited to, the following:

53

a. The Corps' sampling within the Upper Cuyahoga Navigation Channel was not representative of the Upper Mile sediment.

b. The Corps' sampling at CLA-1 and the analysis of the CLA-1 data was not representative of background Lake conditions.

c. The Corps' sampling at disposal area CLA-1 was not representative of the sediment at CLA-1.

d. Use of CLA-1 or CLA-4 as reference sediment for analysis under the Inland Testing Manual is prohibited because those sites have been impacted by the prior disposal of dredged material.

e. Use of CLA-1 as sample location for analysis under the Great Lakes Testing Manual is prohibited because CLA-1 has been contaminated by a spill that biased the test results.

f. The Corps deviated from the evaluation protocols of the Great Lakes Testing Manual and Inland Lakes Manual.

g. Failure at Tier 3 of the Great Lakes Testing Manual for PCB bioaccumulation ends the evaluation and prohibits open lake disposal; however, the Corps went beyond the failure at Tier 3 without authority or precedent.

h. The Corps performed a Tier 4 analysis without first consulting with or otherwise involving the Ohio EPA or U.S. EPA.

i. The Corps' Tier 4 analysis was conducted in a manner contrary to the Great Lakes Testing Manual and Inland Testing Manual.

54

j.  In the alternative, the Corps used standards or methods unsupported by the Great Lakes Testing Manual and Inland Testing Manual in lieu of performing an appropriate Tier 4 analysis.

k.  The Corps used a draft guidance document to support its 404(b)(1) evaluation, which is not a binding rule and had not been peer-reviewed nor approved by U.S. EPA.

l.  The Corps manipulated the improperly utilized draft guidance document to achieve the conclusion the Corps wanted—open-Lake disposal—when that draft guidance document failed to justify the Corps' previously made determination.

m.  CDF disposal would have a lesser environmental impact than open-Lake disposal and therefore open-Lake disposal is prohibited by U.S. EPA's 404(b)(1) guidelines.

n.  Open-Lake disposal would violate Ohio's water quality standards and therefore would violate U.S. EPA's 404(b)(1) guidelines.

245.  Open-Lake Disposal of the Upper Mile sediment at CLA-1 cannot lawfully be the Federal Standard because it is inconsistent with Federal law for reasons including the following:

a.  The Corps has not obtained an Ohio Water Quality Certification for the disposal of dredged material from the 2016 Project into Lake Erie.

b.  The disposal of dredged material from the 2016 Project into Lake Erie would not be consistent with Ohio's CMP to the maximum extent practicable.

c.  The disposal of dredged material from the 2016 Project into Lake Erie would be prohibited under NEPA because the Corps was required to issue an EIS for that activity.

55

d.   The Corps failed to review disposal at the Port's CDF has a practicable alternative that would have less adverse impact on the aquatic ecosystem, whereas the Port's alternative does not have any significant adverse environmental consequences.

246.   Disposal of the dredged material from the 2016 Project into the open waters of Lake Erie cannot be the Federal Standard because the Corps cannot choose to act in violation of the CZMA, the CWA, and/or NEPA.

247.   The Corps acted arbitrarily, capriciously, with an abuse of discretion, not in accordance with the law, in excess of statutory authority, and without observance of its own procedures by declaring that its Federal Standard is open-Lake disposal of the dredged material from the Upper Cuyahoga Navigation Channel and unlawfully applying that Standard to the 2016 Project.

248.   The State of Ohio, the Port, and Ohio citizens, and the environment have suffered a legal wrong or have been adversely affected or aggrieved by the Corps' decision that the disposal of PCB-contaminated sediment, which includes all of the dredged material from the Upper Cuyahoga Navigation Channel from the 2016 Project, into the open waters of Lake Erie is the Federal Standard.  5 U.S.C. § 702.

**COUNT V**
**Declaratory and Injunctive Relief Pursuant to 5 U.S.C. §§ 701-706**
**(Violation of Statutory Requirement to Maintain Navigability of Great Lakes Harbors)**

249.   Plaintiffs hereby incorporate and reassert the foregoing paragraphs of the Complaint.

250.   Under the Water Resources Development Acts of 2000 and 2007, the Corps is required to dredge Federal navigation channels of the Great Lakes, including the Cleveland Harbor, to both maintain navigability and maintain the minimum operation depths.

251.   The sediment in Cleveland Harbor is currently above authorized project limits.

252.   Navigation on the Cleveland Harbor is currently impaired.

253.   The Corps has funds available to complete the 2016 Project.

254.   The Corps has an obligation under WRDA 2007 to use its available funds to dredge the Cleveland Harbor to project depth in order to maintain navigation.

255.   The Corps refuses to complete the 2016 Project.

256.   Additionally the Corps has stated that when dredging is necessary, the Corps asserts that it will not dredge the full Cleveland Harbor in 2016 unless a non-Federal sponsor pays the extra operational costs for disposal of the Upper Mile sediment in a CDF and pays a cost that the Corps has assigned for the value of the space in that CDF.

257.   By failing to dredge the full Cleveland Harbor, portions of that the Cleveland Harbor are and will continue to become shallower than the minimum operational depths and/or will no longer be navigable.

258.   Ohio and the Port have suffered a legal wrong or have been adversely affected or aggrieved by the Corps' action to defer dredging of the Cleveland Harbor in compliance with its statutory duty.  5 U.S.C. § 702.

259.   The Corps' decision to defer dredging of the full Cleveland Harbor is arbitrary and capricious, an abuse of discretion and not in accordance with law in violation of the Water Resources Development Acts of 2000 and 2007 and §§ 702 and 706 of the APA.

**COUNT VI**
**Declaratory and Injunctive Relief Pursuant to 5 U.S.C. §§ 701-706**
**(Unlawful Delegation of Authority)**

260.  Plaintiffs hereby incorporate and reassert the foregoing paragraphs of the Complaint.

261.  The Corps' refusal to dredge the full Cleveland Harbor and put the dredged material into a confined disposal facility unless a non-Federal sponsor pays the cost difference between the CDF disposal and open-Lake disposal is arbitrary, capricious, and not in accordance with law.

262.  Under the Water Resources Development Act of 1986, "[t]he Federal share of the cost of operation and maintenance of each navigation project for a harbor or inland harbor constructed by the Secretary pursuant to this Act or any other law approved after November 17, 1986, shall be 100 percent." 33 U.S.C. § 2211(b)(1).

263.  The Corps has no authority, in statute or otherwise, to require a non-Federal sponsor to pay for operation and maintenance dredging activities necessary for Federal navigation channels that are the responsibility of the Corps.

264.  By requiring a non-Federal sponsor to pay for the dredging of the Cleveland Harbor, the Corps has unlawfully delegated or otherwise refused to meet its responsibilities under Water Resources Development Acts of 1986, 2000, and 2007.

265.  Ohio and the Port have suffered a legal wrong or have been adversely affected or aggrieved by the Corps' unlawful delegation.  5 U.S.C. §702.

266.  The Corps' attempted delegation and actions in accordance therewith are arbitrary and capricious, an abuse of discretion and not in accordance with law in violation of § 706 of the APA.

## RELIEF REQUESTED

**WHEREFORE**, Plaintiff prays for relief as follows:

A.      Order, declare, and adjudge that what the Corps claims to be its December 2014 Federal Standard determination (or any other more recent Federal Standard determination, which has not been shared with Ohio), which is being applied to the 2016 Project and which declares that the Federal Standard is disposal of dredged material from the 2016 Project into the open waters of Lake Erie, is arbitrary, capricious, an abuse of discretion, in violation of law and in violation of the CZMA, the CWA, NEPA, and/or the APA;

B.      Order, declare, and adjudge that because what the Corps claims to be its December 2014 Federal Standard determination (or any other more recent Federal Standard determination, which has not been shared with Ohio) is invalid or was never formalized and that the Federal Standard for the Upper Mile sediment remains CDF disposal until properly changed;

C.      Order, declare, and adjudge that the Corps is in violation of NEPA and the APA by unlawfully failing to issue an Environmental Impact Statement for the 2016 Project for the decision to dispose of the dredged material from the 2016 Project into the open waters of Lake Erie;

D.      Order, declare, and adjudge that the Corps is in violation of NEPA and the APA by unlawfully failing to issue an Environmental Impact Statement or Environmental Assessment for the decision to dispose of the dredged material from the 2016 Project at CLA-1 as a remedial activity;

E.      Order and enjoin the Corps to develop and complete an Environmental Impact Statement regarding their decision to dispose of dredged material from the annual Cleveland

Harbor Dredging Projects into the open waters of Lake Erie before the Corps can make a new determination that the Federal Standard is open-Lake disposal;

F.      Order, declare, and adjudge that the Corps' Federal Standard alternative must be an alternative that complies with the CZMA, the CWA, NEPA, and the applicable and issued State Water Quality Certification;

G.      Order and enjoin the Corps to dredge the full Cleveland Harbor without disposing of any dredged material into the open waters of Lake Erie until the Corps complies with NEPA and properly evaluates the alternative of deferring dredging;

H.      Order, declare, and adjudge that the Corps' Federal Standard must be an alternative that complies with Ohio's Federally-approved Coastal Management Program, including Ohio's water quality standards and the Water Quality Certification issued consistent therewith;

I.      Order, declare, and adjudge that the Corps cannot demand that non-Federal sponsors pay for any costs that are incurred in the 2016 Project that are required to comply with Ohio's Federally-approved Coastal Management Program and Ohio's Federally-enforceable Water Quality Certification;

J.      Order, declare, and adjudge that for the purpose of determining compliance with U.S. EPA's 404(b)(1) guidelines, Ohio determines compliance with Ohio water quality standards, through its Federally delegated water quality certification process.

K.      Order Defendants to dredge the full Cleveland Harbor in 2016 without disposing of any dredged material from the 2016 Project into the open waters of Lake Erie;

L.      Order Defendants to place all dredged material from the 2016 Project in a confined disposal facility or other suitable upland disposal sites;

60

M.      Enjoin Defendants from requiring that a non-Federal sponsor pay for the disposal of dredged material from the 2016 Project into a confined disposal facility or upland site;

N.       Enjoin Defendants from disposing of dredged material from future Cleveland Harbor Dredging Projects into the open waters of Lake Erie until the Corps (1) issues a legally and factually sufficient EIS for the disposal of dredged material from the Cleveland Harbor into Lake Erie pursuant to NEPA; (2) obtains a water quality certification from the Ohio Environmental Protection Agency for disposal of dredged material from the Cleveland Harbor into the open waters of Lake Erie, as required by the CWA; and (3) receives a concurrence from the Ohio Department of Natural Resources that disposal of dredged material from the Cleveland Harbor into the open waters of Lake Erie is consistent with Ohio's CMP pursuant to the CZMA;

O.      Retain jurisdiction to review the Corps' compliance with all judgments and orders entered into herein;

P.      Award reimbursement of the State and Port's costs of litigation and reasonable attorney fees; and

Q.      Order such other relief as the Court deems appropriate and just.


Respectfully submitted,

**MICHAEL DeWINE**
**OHIO ATTORNEY GENERAL**

/s/   *David Emerman*
**DALE T. VITALE (0021754)**
**DAVID E. EMERMAN (0089348)**
**JANEAN WEBER (0083960)**
**AARON FARMER (0080251)**
Assistant Attorneys General
Environmental Enforcement Section
30 East Broad Street, 25th Floor
Columbus, Ohio 43215-3400

61

Telephone:  (614) 466-2766
Facsimile:  (614) 644-1926
Dale.Vitale@OhioAttorneyGeneral.gov
David.Emerman@OhioAttorneyGeneral.gov
Janean.Weber@OhioAttorneyGeneral.gov
Aaron.Farmer@OhioAttorneyGeneral.gov


**RICHARD COGLIANESE (0066830)**
Principal Assistant Attorney General
30 East Broad Street, 23rd Floor
Columbus, Ohio 43215
Telephone: (614) 644-7257
Facsimile: (614) 752-4677
Richard.Coglianese @OhioAttorneyGeneral.gov

*Counsel for Plaintiff, State of Ohio*




*s/ Louis L. McMahon*
LOUIS L. McMAHON (0067378)
KEELY J. O'BRYAN (0071438)
McMAHON DeGULIS LLP
The Caxton Building
812 Huron Road E, Suite 650
Cleveland, Ohio 44115
Telephone: (216) 621-1312
Facsimile: (216) 621-0577
lmcmahon@mdllp.net
kobryan@mdllp.net


*Counsel for Plaintiff,*
*Cleveland-Cuyahoga County Port Authority*

62